Filed 10/23/15  Aguirre v. Rippy CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| JENNIE AGUIRRE et al., | B257260 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC450023) |
| v. | |
| FRANCINE RIPPY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Park & Sylva, Daniel E. Park, Shahram Shayesteh, Christopher C. Cianci; Daniel E. Park Law Corporation, Daniel E. Park, Shahram Shayesteh, Christopher C. Cianci, for Plaintiffs and Appellants.

Squire Patton Boggs, Chris M. Amantea, Adam R. Fox, Helen H. Yang; Dinsmore & Sandelmann, Frank Sandelmann, for Defendant and Respondent.

## INTRODUCTION

Plaintiffs and appellants Jennie Aguirre, Glenn DiCaro, Judy Gilleland, Rosemary Islava, Aliyah Islava, Ruth Linnea Karmelich, Ruben Lopez, and Olivia Santos (plaintiffs) brought an action against, inter alia, defendant and respondent Francine Rippy (defendant) concerning the alleged chemical contamination of their workplace.[1]  The trial court granted defendant's motion for summary judgment (summary judgment motion) with respect to the fifth amended complaint.  On appeal, plaintiffs contend that the trial court erred in granting summary judgment because there are triable issues of material fact as to their causes of action for negligence, strict liability for ultrahazardous activity, and public nuisance.  Plaintiffs also contend that defendant failed to meet her burden of proof in demonstrating that they cannot establish causation and there is a triable issue of material fact with respect to causation.  We affirm.

## BACKGROUND

In their fifth amended complaint, plaintiffs asserted causes of action for negligence, strict liability for ultrahazardous activity, and public nuisance alleging that Omega Chemical Corporation (Omega) illegally stored and dumped chemicals on two parcels of land—12504 and 12512 Whittier Boulevard in the City of Whittier, California—that later became known as the Omega Chemical Superfund Site (Omega Site).  Fred R. Rippy, Inc. owned the property at 12504 Whittier Boulevard from 1963 until 1966 when it transferred its ownership interest to its then president Fred R. Rippy, defendant's husband.  In 1986, Mr. Rippy transferred ownership of 12504 Whittier Boulevard to the Fred R. Rippy Trust (Rippy Trust).  Defendant and Mr. Rippy owned the property at 12512 Whittier Boulevard from about June 1984 to October 1986, when

---

[1]     Plaintiffs alleged that Aliyah Islava's mother Rosemary Islava worked in the workplace when Aliyah was in gestation.

they transferred the property to the Rippy Trust.[2]  From 1976 until 1987, Omega leased 12504 Whittier Boulevard.  In 1987, the Rippy Trust granted ownership of 12504 and 12512 to Omega.

According to plaintiffs, from 1976 to 1991, Omega operated a spent solvent and refrigerant recycling and treatment facility on the Omega Site.  The facility treated commercial and industrial solid and liquid waste consisting of chlorinated and aromatic solvents and other hydrocarbons and chlorofluorocarbons and operated as a transfer station for the storage and consolidation of waste for shipment to other treatment and/or disposal facilities.  The facility stored large quantities of waste on the property.  The improper storage and handling of the waste, including leaking storage tanks and spills, resulted in contamination of the soil and groundwater.  According to the Environmental Protection Agency (EPA), the toxic chemicals migrated through the soil as gas and entered adjacent buildings through cracks in basements, foundations, sewer lines, and other channels.

Plaintiffs alleged that during the time that defendant owned 12512 Whittier Boulevard, the property had been and was contaminated, which contamination was visible in aerial photographs.  Plaintiffs claimed that the spillage and staining on 12512 Whittier Boulevard was caused or contributed to by Omega's operations on that property or on 12504 Whittier Boulevard.  They alleged that any reasonable, diligent property owner would have noticed and been aware of the significant spillage and staining on 12512 Whittier Boulevard, and that defendant knew or should have known of the contamination

According to plaintiffs, during the time that defendant owned 12512 Whittier Boulevard, the Los Angeles County Health Department sent a number of violation notices concerning soil and groundwater contamination at or around 12504 Whittier Boulevard caused by Omega's operations.  As owner of an adjacent property, defendant knew or should have known about the contamination and the public notices concerning

---

[2]     Defendant may have retained some interest in the property as she released and quitclaimed her interest in the property to the Rippy Trust in September 1987.

3

12504 Whittier Boulevard and the effect that such contamination would have on her and other surrounding properties. Moreover, during defendant's ownership of 12512 Whittier Boulevard, environmental investigative work was conducted on 12504 Whittier Boulevard, which investigative work found "ground/soil surface and subsurface contamination at the Omega Site." Defendant knew or should have known about the investigative work.

Defendant failed to investigate to determine the spread of the contamination to adjacent properties, plaintiffs claimed, despite having notice of the contamination and the need for such an investigation. Defendant had a duty to investigate and mitigate the contamination on her property.

Except for Aliyah Islava, plaintiffs alleged that they worked at the Tri-Cities Regional Occupational Program (ROP), which occupied the property at 12519 East Washington Avenue (ROP Site) across the street from the Omega Site, and that they were exposed to chemicals that migrated from the Omega Site to the ROP Site through the soil and groundwater.[3] Plaintiffs further alleged that defendant acquired ownership of the ROP Site in 1977 and leased it to the ROP from November 1998 to 2012. They contended that defendant had notice that the Omega Site contamination had reached the ROP Site but failed to investigate and mitigate the contamination on the property in a timely manner or to warn them of the foreseeable harm. As a result of the contamination to which they claimed they were exposed, plaintiffs alleged they suffered from the following: Ms. Aguirre—neuralgia, abnormal cells on her cervix, a two centimeter cyst in her ovary, Eagle Syndrome, and thyroid cysts; Mr. DiCaro—esophageal cancer; Ms. Gilleland—thyroid cancer, a cyst on her ovary, cervical discharge, breast cancer, and several lipoma tumors in her neck; Rosemary Islava—a severe rash, redness, and itching all over her body resulting in blisters during her pregnancy with Aliya; Aliya Islava— medulloblastoma (brain cancer); Ms. Karmelich—breast cancer and lymphoma in her

---

[3]     See footnote 1 above.

4

lungs and bones; Mr. Lopez—benign tumors on his head and neck; and Ms. Santos—monoclonal gammopathy.

According to plaintiffs, defendant was serving or had served as a board of directors board member, president, and chief executive officer (CEO) of Fred R. Rippy, Inc. She was Fred R. Rippy, Inc.'s CEO in 1998 when it leased the ROP Site to the ROP. As CEO, defendant would or should have known of investigations conducted by the EPA and by consultants hired by the Fred R. Rippy Trust and the results of those investigations. Defendant knew or should have known that the Omega Site was contaminated before Fred R. Rippy, Inc. leased the ROP Site to the ROP. Despite requests from the ROP "for such knowledge," defendant failed to inform the ROP of the contamination. In 1999, defendant was aware of evidence that suggested that the use of chemicals and solvents at the Omega Site contributed to groundwater contamination that had spread "down-gradient" of the Omega Site and failed to inform the ROP.

Despite her knowledge of the contamination, defendant failed to take any action to investigate or to assist in the investigation of the Omega Site or the ROP Site. She further failed to take any action to mitigate or remediate or to assist in any mitigation or remediation efforts at the Omega Site or the ROP Site. She also failed to notify the ROP, plaintiffs, or any of the ROP's employees of the contamination.

In light of the allegations in the fifth amended complaint, defendant moved for summary judgment asserting the following five undisputed material facts: (1) defendant never had an interest in, operations on, or the ability to control 12504 Whittier Boulevard or the ROP Site; (2) defendant's only interest in 12512 Whittier Boulevard was as a joint tenant with her husband from June 7, 1984, through October 1, 1986; (3) during her ownership of 12512 Whittier Boulevard, defendant was never made aware that contamination from any source posed a threat to human health to persons within the buildings on the ROP Site, or likely would pose such a threat in the future; (4) defendant never released to soil or groundwater anywhere trichloroethylene, perchloroethylene, methylene chloride, or benzene; and (5) plaintiffs claimed adverse health effects were not caused by their exposures at the ROP Site to trichloroethylene, perchloroethylene,

5

methylene chloride, or benzene. Defendant repeated and relied on those same facts with respect to each of plaintiffs' causes of action.

In support of its summary judgment motion, among other evidence, defendant submitted a report from Barbara D. Beck, Ph.D., DABT (Diplomate, American Board of Toxicology), FATS (Fellow, Academy of Toxicological Sciences), a toxicologist who specialized in human health risk assessment. Dr. Beck performed hypothetical cancer and non-cancer risk assessments in accordance with EPA guidelines and toxicity criteria and California cancer and non-cancer toxicity levels using plaintiffs' respective employment histories and indoor air data information for the ROP Site during the period from March 2010 to December 2012. She "[q]ualitatively and quantitatively evaluated the potential for causal associations between exposures to the [chemicals of concern[4]] and Plaintiffs' claimed health effects."

Dr. Beck opined that the cumulative cancer risks—i.e., the sum of all risks posed by the chemicals of concern—did not exceed the EPA's or California's de minimis or "acceptable" risk ranges and the non-cancer risk did not exceed a "hazard index of 1, a level below which no adverse health effects [were] expected." Dr. Beck's findings supported the conclusion that the plaintiffs' potential exposure to the chemicals of concern had "posed negligible cancer or non-cancer risks to any Plaintiff."

Dr. Beck also considered each plaintiff's specific health claims, the plaintiff's length of employment at the ROP Site, and where in the ROP Site the plaintiff worked. She then evaluated the potential for "causal associations" between exposure to the chemicals of concern and the plaintiffs' claimed health effects. Based on her evaluations, she found that there was no "reliable qualitative and/or quantitative evidence that a causal association exist[ed] between Plaintiffs' potential exposures to the [chemicals of concern] and the claimed health effects." Dr. Beck "conclude[d], to a reasonable degree of scientific certainty, that it [was] highly unlikely that Plaintiffs' potential exposures to [the chemicals of concern] in indoor air at the ROP . . . buildings could have caused or

---

**4**    Dr. Beck identified the "chemicals of concern" as tetracholoroethylene (apparently another name for perchloroethylene), trichloroethylene, benzene, and methylene chloride.

6

actually caused their claimed health effects or could cause adverse health effects in the future. Furthermore, there [was] no reasonable basis to conclude otherwise."

Plaintiffs filed objections and a motion to strike all or parts of Dr. Beck's declaration and report. The trial court did not expressly rule on plaintiffs' objections, but implicitly overruled them as it relied on Dr. Beck's report in ruling that there was no causal link between plaintiffs' exposure to the chemicals at issue and plaintiffs' maladies.

In opposition to defendant's summary judgment motion, plaintiffs submitted a declaration from Rob C. Hesse, a principal geologist with Soil Water Air Protection Enterprise (SWAPE), who reviewed the history and extent of hazardous waste releases from the Omega Site. In a declaration, Mr. Hesse opined that, based on the informantin he reviewed, "it is obvious that contamination should have been expected to be downgradient of the Omega Site as early as 1988, if not earlier." Mr. Hesse stated, "it can be reasonably concluded that [defendant] had access to information and knowledge of possible hazards at the ROP . . . but failed to act responsibly by informing the ROP tenants and demanding that investigations be conducted to fully assess indoor air risks to ROP occupants." Plaintiffs also submitted a supplemental declaration from Mr. Hesse. The supplemental declaration further addressed the issue of notice.

Plaintiff submitted a report from Paul Rosenfeld, Ph.D., a SWAPE principal and an expert in the fields of environmental chemistry, risk assessment, contaminant exposure assessment, contamination investigation, remediation, ecological restoration, and epidemiological and statistical analysis, who evaluated the toxic air contaminants to which plaintiffs were exposed at the ROP Site and that addressed opinions Dr. Beck offered in her report. Dr. Rosenfeld criticized Dr. Beck's report because the opinions expressed in it concerning historical exposure at the ROP Site were based on indoor air monitoring data collected after March 2010, which data primarily included results for tests performed after mitigation actions were taken at the site. According to Dr. Rosenfeld, Dr. Beck's report did not consider historic chemical concentrations in the ROP Site from 1999 to 2010. Dr. Rosenfeld stated that vapor intrusion modeling demonstrated that plaintiffs were historically exposed to concentrations of contaminants

7

inside the ROP Site buildings that greatly exceeded the levels that Dr. Beck supposed were present and upon which she based her evaluation. He concluded, therefore, that Dr. Beck's analysis was inadequate and unreliable for assessing plaintiffs' exposures.

Plaintiffs also submitted a report from Vera S. Byers, M.D., Ph.D., an expert in the fields of environmental toxicology, pharmaceutical toxicology, autoimmune diseases, exposure of populations to a variety of industrial chemicals including trichloroethylene, perchloroethylene, and methylene chloride, who opined on the source of plaintiffs' maladies using contamination exposure levels provided by SWAPE. As to Aliyah Islava, Dr. Byers concluded that "Rosemary Islava's exposure to the [perchloroethylene, tricholorethylene] and methylene chloride at her workplace caused or substantially contributed to her daughter Aliyah Islava's medulloblastoma." With respect to Rosemary Islava, Dr. Beck stated, "It is my opinion to a reasonable medical probability that the prolonged exposure of Mrs. Islava to [tricholorethylene] at her workplace was the cause or a substantial factor contributing to her severe rash."

With respect to Ms. Gilleland's and Ms. Karmelich's breast cancer, Dr. Byers stated, "In conclusion there is definitely a causal association between exposure to the three chlorinated hydrocarbons under discussion in this case and breast cancer. I conclude that exposure to the three chlorinated hydrocarbons in this case was a factor in the development of breast cancer suffered by these two women." Dr. Byers opined that "to a reasonable degree of medical certainty that Ms. Santos's exposure to the chemicals in question in this case caused or substantially contributed to her [monoclonal gammopathy]."

As for Mr. DiCaro's esophageal cancer, Dr. Byers opined "to a reasonable degree of medical certainty that the exposure to the chemicals in question in this case was a factor in Mr. DiCaro's esophageal cancer. Given, however, the smoking history in this case, I am unable to quantitate the significance of this factor." With respect to Ms. Aguirre's peripheral neuropathy, Dr. Byers stated, "there is a causal association between exposure to the three chlorinated hydrocarbons under discussion in this case and peripheral neuropathy. Without further information I am unable to opine on the

8

significance of Ms. Aguirre's exposure to the chemicals in question in this case in the causation of her peripheral neuropathy." Dr. Byers concluded, "to a reasonable degree of medical certainty that the workplace exposure to the chlorinated hydrocarbons especially [tricholorethylene] caused or substantially contributed to the Monday morning headaches suffered by Mr. Lopez" when he went to work and opened up the ROP.

Defendant filed objections to Mr. Hesse's declaration and supplemental declaration and Dr. Rosenfeld's report. Defendant also filed objections to Dr. Byers's report. Based on the appellate record plaintiffs provided, it appears that plaintiffs did not file responses to defendant's objections. The trial court did not rule on the objections to Mr. Hesse's declaration and supplemental declaration and Dr. Rosenfeld's report and sustained the objections to Dr. Byers's report. Plaintiffs do not challenge on appeal the trial court's ruling sustaining defendant's objections to Dr. Byers's report.

The trial court granted defendant's summary judgment motion. In its discussion of plaintiffs' negligence cause of action, it stated that Dr. Beck's testimony "to a reasonable degree of scientific certainty, that 'it is highly unlikely that Plaintiffs' potential exposures . . . . could have . . . caused their claimed health effects . . . '" was credible. It further stated that "Plaintiffs' evidence is insufficient to raise a triable issue as to causation."

## DISCUSSION

Plaintiffs contend that there are triable issues of material fact as to their causes of action for negligence, strict liability for ultrahazardous activity, and public nuisance. They also contend that defendant failed to meet her burden of proof in demonstrating that they cannot establish causation and there is a triable issue of material fact with respect to causation. We hold that defendant met her burden of proof in demonstrating that

9

plaintiffs cannot establish causation and there is no triable issue of material fact with respect to causation.**5**

## I.     Standard of Review

"Summary judgment is granted when the moving party demonstrates that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2).)  We review an appeal of a summary judgment de novo, as the appeal only involves legal issues.  (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017 [90 Cal.Rptr.3d 1, 201 P.3d 1147].)"  (*Greene v. Bank of America* (2015) 236 Cal.App.4th 922, 932.)

## II.     Causation

Plaintiffs contend that the trial court improperly placed the burden on them of demonstrating causation and failed to consider whether defendant made a prima facie showing that there were no triable issues of material fact with respect to causation.  In addition to that error, plaintiffs contend, the trial court erred in failing to find that they demonstrated a triable issue of material fact with respect to causation.

### A.     Defendant Made a Prima Facie Showing That There Are No Triable Issues of Material Fact as to Causation

A defendant has met its burden of showing that there is no merit to a cause of action and thus is entitled to summary judgment by showing that one or more elements of

---

**5**     Because we hold that plaintiffs cannot demonstrate causation, we need not reach their claims that there are other triable issues of material fact as to their causes of action for negligence, strict liability for ultrahazardous activity, and public nuisance.

10

a cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (p)(2); *Greene v. Bank of America, supra,* 236 Cal.App.4th at p. 932.) Causation is an element in every tort action. (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal. 4th 861, 876.)

Plaintiffs contend that the trial court failed to consider whether defendant made a prima facie case that they could not prove causation. They claim that defendant failed to make such a case because defendant's expert, Dr. Beck, was not qualified to offer conclusions about plaintiffs' medical conditions because she was a toxicologist and not a medical doctor, her report lacked a foundation because she provided a conclusion on causation without any basis or analysis, and she failed to consider plaintiffs' long-term exposure and based her analysis on contamination levels beginning in March 2010. Apparently, plaintiffs contend that the trial court erred in failing to exclude Dr. Beck's report. Whether we review the trial court's implicit rejection of plaintiffs' objections to Dr. Beck's report de novo or under an abuse of discretion standard (see *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535), the trial court properly considered the report.

Dr. Beck did not testify as an expert in medicine and thus did not render her opinion on causation to a """"reasonable *medical* probability.""" (See *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th. 71, 79, italics added.) Rather, she testified as an expert in science and opined "to a reasonable degree of *scientific* certainty, that it [was] highly unlikely that Plaintiffs' potential exposures to [the chemicals of concern] in indoor air at the ROP . . . buildings could have caused or actually caused their claimed health effects or could cause adverse health effects in the future." (Italics added.) Dr. Beck was qualified to render that opinion. She was a Fellow and Past President of the Academy of Toxicological Sciences and a Visiting Scientist in the Department of Environment Health at the Harvard School of Public Health. She had been a Regional Expert in Toxicology and Chief of the Air Toxics Staff at Region 1 of the EPA. She became a Diplomate of the American Board of Toxicology—i.e., board certified—in 1988, and specialized in human health risk assessment. In ruling that plaintiffs could not establish causation, the trial court found credible Dr. Beck's opinion to a reasonable degree of scientific certainty

11

that it was highly unlikely that plaintiffs' potential exposures to the chemicals of concern could have caused their claimed health effects. A trial court has "considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*People v. Kelly* (1976) 17 Cal.3d 24, 39, abrogated by statute on another point as explained in *People v. Wilkinson* (2004) 33 Cal.4th 821, 845-848.)

There was a sufficient foundation for Dr. Beck's report. In Dr. Beck's detailed report, she stated that she relied on case-specific documents such as medical records, questionnaires, depositions, air quality data, complaints, and Dr. Byers's and Dr. Rosenfeld's declarations; general guidance documents in the fields of toxicology and risks assessment by the EPA, Agency for Toxic Substances and Disease Registry (ATSDR), and the California Environmental Protection Agency; environmental and regulatory documents that included toxicity criteria and secondary toxicological reviews of the chemicals of concern; and scientific literature on toxicology, epidemiology, and risk assessment of the relevant chemicals.

As set forth above, Dr. Beck performed hypothetical cancer and non-cancer risk assessments in accordance with EPA guidelines and toxicity criteria and California cancer and non-cancer toxicity levels using plaintiffs' respective employment histories and indoor air data information for the ROP Site during the period from March 2010 to December 2012. She considered each plaintiff's specific health claims, the plaintiff's length of employment at the ROP Site, and where in the ROP Site the plaintiff worked. She then evaluated the potential for "causal associations" between exposure to the chemicals of concern and the plaintiff's claimed health effects.

In that evaluation, relying on ATSDR toxicological profiles for the chemicals of concern, she first "evaluated qualitatively whether scientific evidence exist[ed] to support a causal relationship between exposures to the [chemicals of concern] and claimed health effects under any conditions." Next, she "compared the highest UCLM [upper confidence limit of the mean] exposure concentrations in the ROP building to [chemicals of concern]-specific health-based toxicity criteria (reference concentrations, or RfCs) and

12

points of departure (PODs).  The RfC is an estimate (with uncertainty spanning perhaps an order of magnitude) of continuous inhalation exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime . . . .  PODs are 'the dose-response point that marks the beginning of a low-dose extrapolation' . . . to a cancer or non-cancer toxicity criterion.  For air contaminants, the POD is traditionally the lowest concentration at which adverse effects have been observed in humans or animals, or the highest concentration at which no adverse effects have been observed.  To evaluate the potential for non-cancer effects, [she] compared UCLM exposure concentrations to the RfC and POD from which the RfC was derived. . . .  To evaluate the potential for cancer effects, [she] compared UCLM exposure concentrations to the POD serving as the starting point for deriving US EPA inhalation cancer criteria (*i.e.*, inhalation unit risks)."

In reaching her conclusions, Dr. Beck considered historic chemical exposure levels.  Dr. Beck relied on indoor air data from several rooms in the ROP taken from March 2010 to December 2012.  She then calculated the maximum value for each chemical of concern for each room.  Based on that data, she conducted a hypothetical risk assessment for the following scenario:  a full-time worker at the ROP for 14 years who was exposed at all times to the highest UCLM concentration for each chemical of concern.  Dr. Beck's use of actual indoor air data and maximum exposure levels for each chemical properly considered historic levels of chemical contamination.

Plaintiffs also argue that the trial court held them to an improperly high standard of proof on summary judgment.  Instead, plaintiffs argue, they were only required to raise a triable issue of material fact as to the causal connection between the alleged contaminants and their asserted maladies.  The trial court did not hold plaintiffs to an improperly high standard in opposing defendant's summary judgment motion.  With respect to each of plaintiffs' causes of action, the trial court expressly stated in its ruling that plaintiffs failed to establish a material issue of fact.  Thus, the trial court applied the correct standard in ruling on defendant's summary judgment motion.

B.      *Plaintiffs Failed to Demonstrate a Triable Issue of Material Fact as to*
        *Causation*

In its ruling granting summary judgment, the trial court stated with respect to plaintiffs' negligence cause of action, "In connection with defendant Fred Rippy's prior motion for summary judgment, the Court found Dr. Beck's testimony [i.e., her conclusion, to a reasonable degree of scientific certainty, that 'it is highly unlikely that Plaintiffs' potential exposures . . . could have . . . caused their claimed health effects . . .'] to be credible. At the same time, the Court sustained objections to the testimony provided by Plaintiffs' expert, Dr. Vera Byers. Defendant's objections are likewise sustained here. Dr. Byers' statements re 'reasonable medical probability' are conclusory only, and are improperly based on 'associations' between exposure and certain illnesses, and speculative SWAPE opinions re the degree and duration of exposure. There is nothing before the Court in the instant motion to change the Court's rulings re those objections. Thus, Plaintiffs' evidence is insufficient to raise a triable issue as to causation."**6** Plaintiffs contend that the trial court erred in granting defendant summary judgment based on its causation ruling because they showed a triable issue of material fact concerning causation.

As plaintiffs explain in their reply brief, their evidentiary showing on causation consisted of two parts. First, Mr. Hesse and Dr. Rosenfeld provided evidence of the levels of chemical exposure that each of the plaintiffs suffered at the ROP Site. Second, based on that chemical exposure evidence, Dr. Byers "considered whether causal connections existed between Plaintiffs' exposure to the subject chemicals and Plaintiffs' medical conditions or issues with their health." Dr. Byers's expert opinion was the only evidence that specifically addressed that aspect of causation—i.e., that addressed whether

---

**6**      Although the trial court stated its ruling on causation in connection with plaintiffs' negligence cause of action, plaintiffs' causation theory was the same as to each of their causes of action—i.e., exposure to the chemicals at issue in this case caused plaintiffs' maladies. Accordingly, the trial court's causation ruling applied with equal force to plaintiffs' causes of action for strict liability for ultrahazardous activity and public nuisance.

14

there was a causal link between plaintiffs' alleged exposure to the chemicals at issue in this case and plaintiffs' asserted maladies. As set forth above, however, defendant objected to Dr. Byers's report, plaintiffs did not respond to those objections, and the trial court sustained the objections. When the trial court sustained defendant's objections to Dr. Byers's report, Dr. Byers's report was excluded from plaintiffs' evidentiary showing. Plaintiffs have not challenged the trial court's ruling on appeal. Accordingly, by failing to respond to the objections to Dr. Byers's report in the trial court and by failing to challenge the trial court's ruling on those objections on appeal, plaintiffs have forfeited any challenge to the trial court's ruling. Without Dr. Byers's opinion on causation, plaintiffs are unable to show that the trial court erred in finding that plaintiffs failed to show a triable issue of material fact and thus erred in granting defendant summary judgment.

**DISPOSITION**

The judgment is affirmed. Defendant is awarded its own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


TURNER, P. J.


BAKER, J.


15