Filed 10/23/15  Aguirre v. Fred R. Rippy, Inc. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JENNIE AGUIRRE et al., | B255438 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC450023) |
| v. | |
| FRED R. RIPPY, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Park & Sylva, Daniel E. Park, Shahram Shayesteh, Christopher C. Cianci; Daniel E. Park Law Corporation, Daniel E. Park, Shahram Shayesteh, Christopher C. Cianci, for Plaintiffs and Appellants.

Squire Patton Boggs, Chris M. Amantea, Adam R. Fox, Helen H. Yang; Dinsmore & Sandelmann, Frank Sandelmann, for Defendant and Respondent.

# INTRODUCTION

Plaintiffs and appellants Jennie Aguirre, Glenn DiCaro, Judy Gilleland, Rosemary Islava, Aliyah Islava, Ruth Linnea Karmelich, Ruben Lopez, and Olivia Santos (plaintiffs) brought an action against, inter alia, defendant and respondent Fred R. Rippy, Inc. (defendant) concerning the alleged chemical contamination of their workplace.[1] The trial court (Judge Daniel J. Buckley) denied defendant's motion for summary judgment with respect to plaintiffs' second amended complaint. Plaintiffs subsequently filed amended complaints culminating in the fifth amended complaint. Defendant filed a motion for summary judgment or, in the alternative, summary adjudication (summary judgment motion) with respect to the fifth amended complaint. Because the matter had been transferred to a new trial court, a different judge (Judge Richard L. Fruin, Jr.) heard the second summary judgment motion. Judge Fruin granted the motion. On appeal, plaintiffs contend that the trial court erred in granting summary judgment because Code of Civil Procedure section 437c, subdivision (f)(2) (section 437c(f)(2)) bars a second summary judgment motion based on issues the moving party asserted in a prior unsuccessful summary judgment motion unless the second motion is based on newly discovered facts or a change of law, and because there are triable issues of material fact as to their causes of action for negligence, strict liability for ultrahazardous activity, and public nuisance. We affirm.

# BACKGROUND

In their fifth amended complaint, plaintiffs asserted causes of action for negligence, strict liability for ultrahazardous activity, and public nuisance alleging that Omega Chemical Corporation (Omega) illegally stored and dumped chemicals on two parcels of land—12504 and 12512 Whittier Boulevard in the City of Whittier, California—that later became known as the Omega Chemical Superfund Site (Omega Site). Defendant owned the property at 12504 Whittier Boulevard from 1963 until 1966

---

[1] Plaintiffs alleged that Aliyah Islava's mother Rosemary Islava worked in the workplace when Aliyah was in gestation.

when it transferred its ownership interest to its then president Fred R. Rippy. In 1986, Mr. Rippy transferred ownership of 12504 Whittier Boulevard to the Fred R. Rippy Trust (Rippy Trust). Mr. Rippy and his wife, Francine Rippy, purchased the property at 12512 Whittier Boulevard. In October 1986, they transferred this property to the Rippy Trust.[2] From 1976 until 1987, Omega leased 12504 Whittier Boulevard. In 1987, the Rippy Trust granted ownership of 12504 and 12512 to Omega.

Plaintiffs alleged that during the time that defendant owned 12504 Whittier Boulevard, defendant conducted machine shop operations on the property. It specialized in making electric motor laminations and frequently used solvents to clean machinery and metal products during the manufacturing and finishing processes.

According to plaintiffs, from 1976 to 1991, Omega operated a spent solvent and refrigerant recycling and treatment facility on the Omega Site. The facility treated commercial and industrial solid and liquid waste consisting of chlorinated and aromatic solvents and other hydrocarbons and chlorofluorocarbons and operated as a transfer station for the storage and consolidation of waste for shipment to other treatment and/or disposal facilities. The facility stored large quantities of waste on the property. The improper storage and handling of the waste, including leaking storage tanks and spills, resulted in contamination of the soil and groundwater. According to the Environmental Protection Agency (EPA), the toxic chemicals migrated through the soil as gas and entered adjacent buildings through cracks in basements, foundations, sewer lines, and other channels.

Except for Aliyah Islava, plaintiffs alleged that they worked at the Tri-Cities Regional Occupational Program (ROP), which occupied the property at 12519 East Washington Avenue (ROP Site) across the street from the Omega Site, and that they were exposed to chemicals that migrated from the Omega Site to the ROP Site through the soil

---

[2] Mrs. Rippy may have retained some interest in the property as she released and quitclaimed her interest in the property to the Rippy Trust in September 1987.

and groundwater.**3** Plaintiffs further alleged that defendant acquired ownership of the ROP Site in 1977 and leased it to ROP from November 1998 to 2012. They contended that defendant had notice that the Omega Site contamination had reached the ROP Site but failed to investigate and mitigate the contamination on the property in a timely manner or to warn them of the foreseeable harm. As a result of the contamination to which they claimed they were exposed, plaintiffs alleged they suffered from the following: Ms. Aguirre—neuralgia, abnormal cells on her cervix, a two centimeter cyst in her ovary, Eagle Syndrome, and thyroid cysts; Mr. DiCaro—esophageal cancer; Ms. Gilleland—thyroid cancer, a cyst on her ovary, cervical discharge, breast cancer, and several lipoma tumors in her neck; Rosemary Islava—a severe rash, redness, and itching all over her body resulting in blisters during her pregnancy with Aliya; Aliya Islava—medulloblastoma (brain cancer); Ms. Karmelich—breast cancer and lymphoma in her lungs and bones; Mr. Lopez—benign tumors on his head and neck; and Ms. Santos—monoclonal gammopathy.

In light of the allegations in the fifth amended complaint, defendant moved for summary judgment asserting the following seven undisputed material facts: (1) it never had an interest in or operations on 12512 Whittier Boulevard; (2) it had not had an interest in or operations on 12504 Whittier Boulevard for at least 10 years prior to any claimed release of trichloroethylene, perchloroethylene, methylene chloride, or benzene on that property; (3) during the three-year period it owned 12504 Whittier Boulevard—i.e., from 1963 to 1966—it did not receive notice of contamination that posed a threat to human health; (4) it was the landlord of 12519 East Washington Avenue—i.e., the ROP Site—from at least 1998 through 2012; (5) it did not release to the soil or groundwater beneath the ROP Site trichloroethylene, perchloroethylene, methylene chloride, or benzene; (6) it never had actual knowledge that the air or drinking water within the building on the ROP Site was contaminated with trichloroethylene, perchloroethylene, methylene chloride, or benzene at levels that posed a dangerous risk to human health; and

---

**3**      See footnote 1 above.

(7) a probable causal association did not exist between plaintiffs' potential exposures at the ROP Site to trichloroethylene, perchloroethylene, methylene chloride, or benzene and plaintiffs' adverse health effects. Defendant repeated and relied on those same facts with respect to each of plaintiffs' causes of action and to its argument that plaintiffs could not establish causation between the alleged contamination at the ROP Site and their asserted maladies.

In support of its summary judgment motion, defendant submitted a report from Barbara D. Beck, Ph.D., DABT (Diplomate, American Board of Toxicology), FATS (Fellow, Academy of Toxicological Sciences), a toxicologist who specialized in human health risk assessment. Dr. Beck performed hypothetical cancer and non-cancer risk assessments in accordance with EPA guidelines and toxicity criteria and California cancer and non-cancer toxicity levels using plaintiffs' respective employment histories and indoor air data information for the ROP Site during the period from March 2010 to December 2012. She "[q]ualitatively and quantitatively evaluated the potential for causal associations between exposures to the [chemicals of concern[4]] and Plaintiffs' claimed health effects."

Dr. Beck opined that the cumulative cancer risks—i.e., the sum of all risks posed by the chemicals of concern—did not exceed the EPA's or California's de minimis or "acceptable" risk ranges and the non-cancer risk did not exceed a "hazard index of 1, a level below which no adverse health effects [were] expected." Dr. Beck's findings supported the conclusion that the plaintiffs' potential exposure to the chemicals of concern had "posed negligible cancer or non-cancer risks to any Plaintiff."

Dr. Beck also considered each plaintiff's specific health claims, the plaintiff's length of employment at the ROP Site, and where in the ROP Site the plaintiff worked. She then evaluated the potential for "causal associations" between exposure to the chemicals of concern and the plaintiffs' claimed health effects. Based on her evaluations, she found that there was no "reliable qualitative and/or quantitative evidence that a causal

---

[4] Dr. Beck identified the "chemicals of concern" as tetracholoroethylene (apparently another name for perchloroethylene), trichloroethylene, benzene, and methylene chloride.

association exist[ed] between Plaintiffs' potential exposures to the [chemicals of concern] and their claimed health effects." Dr. Beck "conclude[d], to a reasonable degree of scientific certainty, that it [was] highly unlikely that Plaintiffs' potential exposures to [the chemicals of concern] in indoor air at the ROP . . . buildings could have caused or actually caused their claimed health effects or could cause adverse health effects in the future. Furthermore, there [was] no reasonable basis to conclude otherwise."

Plaintiffs filed objections and a motion to strike all or parts of Dr. Beck's declaration and report. The trial court did not rule on plaintiffs' objections because the objections did not comply with the formatting requirements in California Rules of Court rule 3.1354(c).

In opposition to defendant's summary judgment motion, plaintiffs submitted a declaration from Rob C. Hesse, a principal geologist with Soil Water Air Protection Enterprise (SWAPE), who reviewed the history and extent of hazardous waste releases from the Omega Site. In a declaration, Mr. Hesse opined that, based on the information he reviewed, "it is obvious that contamination should have been expected to be downgradient of the Omega Site as early as 1988, if not earlier." Mr. Hesse stated, "it can be reasonably concluded that [defendant] had access to information and knowledge of possible hazards at the ROP . . . but failed to act responsibly by informing the ROP tenants and demanding that investigations be conducted to fully assess indoor air risks to ROP occupants."

Plaintiff also submitted a report from Paul Rosenfeld, Ph.D., a SWAPE principal and an expert in the fields of environmental chemistry, risk assessment, contaminant exposure assessment, contamination investigation, remediation, ecological restoration, and epidemiological and statistical analysis, who evaluated the toxic air contaminants to which plaintiffs were exposed at the ROP Site and that addressed opinions Dr. Beck offered in her report. Dr. Rosenfeld criticized Dr. Beck's report because the opinions expressed therein concerning historical exposure at the ROP Site were based on indoor air monitoring data collected after March 2010, which data primarily included results for tests performed after mitigation actions were taken at the site. Dr. Beck's report did not

6

consider historic chemical concentrations in the ROP Site from 1999 to 2010. He stated that vapor intrusion modeling demonstrated that plaintiffs were historically exposed to concentrations of contaminants inside the ROP Site buildings that greatly exceeded the levels that Dr. Beck supposed were present and upon which she based her evaluation. He concluded, therefore, that Dr. Beck's analysis was inadequate and unreliable for assessing plaintiffs' exposures.

Plaintiffs also submitted a report from Vera S. Byers, M.D., Ph.D., an expert in the fields of environmental toxicology, pharmaceutical toxicology, autoimmune diseases, exposure of populations to a variety of industrial chemicals including trichloroethylene, perchloroethylene, and methylene chloride, who opined on the source of plaintiffs' maladies using contamination exposure levels provided by SWAPE. As to Aliyah Islava, Dr. Byers concluded that Rosemary Islava's "exposure to the [perchloroethylene, tricholorethylene] and methylene chloride in her workplace caused or substantially contributed to her daughter's medul[l]oblastoma." Dr. Beck opined that Rosemary Islava's "exposure to the chlorinated hydrocarbons especially [tricholorethylene] was responsible for the initial toxicity, rash . . . ."

With respect to Ms. Gilleland's and Ms. Karmelich's breast cancer, Dr. Byers stated, "there is a causal association between exposure to [percholorethylene, tricholorethylene, and methylene chloride] and breast cancer." Dr. Byers opined that "to a reasonable degree of medical certainty" Ms. Santos's monoclonal gamopathy "was caused by or substantially contributed to by her exposure to the subject chemicals in this case."

As for Mr. DiCaro's esophageal cancer, Dr. Byers opined that "there is a strong causal association between exposure to [percholorethylene, tricholorethylene, and methylene chloride] in this case and esophageal cancer. The strong smoking history also plays a causal role in this case." With respect to Ms. Aguirre's peripheral neuropathy, Dr. Byers stated, "there is a causal association between exposure to [percholorethylene, tricholorethylene, and methylene chloride] and peripheral neuropathy." Dr. Byers concluded that there was a causal association between exposure to percholorethylene,

tricholorethylene, and methylene chloride and headaches Mr. Lopez suffered on Monday mornings when he went to work and opened up the ROP.

Defendant filed objections to Mr. Hesse's declaration and Dr. Rosenfeld's report. Defendant also filed objections to Dr. Byers's report in whole and in part. Based on the appellate record plaintiffs provided, it appears that plaintiffs did not file responses to defendant's objections. The trial court did not rule on the objections to Mr. Hesse's declaration and Dr. Rosenfeld's report and sustained the objections to Dr. Byers's report. Plaintiffs do not challenge on appeal the trial court's ruling sustaining defendant's objections to Dr. Byers's report.

The trial court granted defendant's summary judgment motion. It ruled, in part, that "plaintiffs' evidence is insufficient to establish a causal connection between their alleged injuries and their alleged exposure to the toxins released on the Omega site."

## DISCUSSION

### I.    Standards of Review

"Summary judgment is granted when the moving party demonstrates that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) We review an appeal of a summary judgment de novo, as the appeal only involves legal issues. (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017 [90 Cal.Rptr.3d 1, 201 P.3d 1147].)" (*Greene v. Bank of America* (2015) 236 Cal.App.4th 922, 932.) Whether a trial court properly heard a renewed summary judgment motion is reviewed for an abuse of discretion. (*Schachter v. Citigroup, Inc.* (2005) 126 Cal.App.4th 726, 733.)

## II.     Defendant's Second Summary Judgment Motion

Like plaintiffs' fifth amended complaint, plaintiffs' second amended complaint asserted causes of action for negligence, strict liability for ultrahazardous activity, and public nuisance. Defendant filed a summary judgment motion as to the second amended complaint. Judge Buckley denied the motion. After plaintiffs filed their fifth amended complaint, defendant filed a summary judgment motion as to that complaint. Judge Fruin granted the motion. Plaintiffs contend that defendant improperly filed their second summary judgment motion in violation of section 437c(f)(2)[5] because it was not based on new facts or new law. Plaintiffs are partially correct. The majority of defendant's second summary judgment motion advanced the same legal arguments based on the same evidence as its first motion. The second motion, however, also asserted a different legal argument—lack of causation—based on new facts. We hold that the trial court should have disregarded that part of defendant's second summary judgment motion that was not based on new facts or new law, but properly considered the causation argument in the motion because it was based on new evidence.

Section 437c(f)(2) prohibits a party from making a renewed summary judgment motion that is not based on new facts or new law. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1096, 1104, 1107; *Schachter v. Citigroup, Inc., supra,* 126 Cal.App.4th at p. 739; *Bagley v. TRW, Inc.* (1999) 73 Cal.App.4th 1092, 1096-1097 [section 437c(f)(2) bars a second summary judgment motion that "reformat[s], condense[s], and cosmetically repackage[s]" a prior summary judgment motion when the motions are otherwise identical].) When, however, a trial court believes that its interim order denying summary judgment might be erroneous it may reconsider that order, on its own motion, even though there are no new facts or law that would justify a second summary judgment motion as long as it gives the parties notice that it may reconsider the order and an

---

**5**     Section 437c(f)(2) provides in relevant part that "a party may not move for summary judgment based on issues asserted in a prior motion for summary adjudication and denied by the court, unless that party establishes to the satisfaction of the court, newly discovered facts or circumstances or a change of law supporting the issues reasserted in the summary judgment motion."

9

opportunity to litigate the issue. (*Le Francois v. Goel, supra,* 35 Cal.4th at pp. 1096-1097, 1107.)

Except for defendant's argument that plaintiffs could not establish causation between the alleged contamination at the ROP Site and their asserted maladies, which argument we address below, the legal grounds defendant asserted in its first and second summary judgment motions were the same. (*Le Francois v. Goel, supra,* 35 Cal.4th at pp. 1096, 1104, 1107; *Schachter v. Citigroup, Inc., supra,* 126 Cal.App.4th at p. 739; *Bagley v. TRW, Inc., supra,* 73 Cal.App.4th at pp. 1096-1097.) With respect to plaintiffs' negligence cause of action, defendant argued in its first summary judgment motion that it did not owe plaintiffs a duty of care because it did not have actual knowledge of the ROP Site contamination. In its second summary judgment motion, defendant also argued that plaintiffs' negligence cause of action failed because it did not owe plaintiffs a duty of care as it did not have actual knowledge that the Omega Site contamination had reached the ROP Site.

As to plaintiffs' cause of action for strict liability for ultrahazardous activity, defendant argued in its first summary judgment motion that the cause of action failed because defendant had not engaged in any activity that could be deemed ultrahazardous. It argued that there was no evidence that it contaminated the Omega Site, its ownership interest in the Omega Site ended 10 years before Omega began its operations on the property, and it only leased the ROP Site to plaintiffs' employer. In its second summary judgment motion, although revised, defendant made the same arguments. It argued that there was no evidence that it engaged in ultrahazardous activity as its only activity with respect to the Omega and ROP Sites was its distant ownership interest in the Omega Site and its ownership and lease of the ROP Site.

Regarding plaintiffs' public nuisance cause of action, defendant argued in its first summary judgment motion that plaintiffs could not show that defendant created or maintained a public nuisance. Defendant argued that it did not have an ownership interest in the Omega Site during the time that Omega contaminated the property. Likewise, in its second summary judgment motion, defendant argued that plaintiffs'

10

public nuisance cause of action failed because it did not own 12054 Whittier Boulevard when the alleged contamination took place, and it was not an active participant in causing the contamination.

We have compared the evidence cited in defendant's separate statements of undisputed material facts in support of the arguments in its first and second summary judgment motions and determined—again with the exception of the evidence cited in support of defendant's causation argument—that the evidence is either identical or any new evidence cited in support of the second summary judgment motion did not materially alter the evidentiary basis for the arguments asserted.[6] Accordingly, defendant did not rely on new facts in connection with all of its points other than causation that would permit it to file a second summary judgment motion as to those points. (*Le Francois v. Goel, supra,* 35 Cal.4th at pp. 1096, 1104, 1107; *Schachter v. Citigroup, Inc., supra,* 126 Cal.App.4th at p. 739; *Bagley v. TRW, Inc., supra,* 73 Cal.App.4th at pp. 1096-1097.)

Defendant contends that its "renewed motion was no redundant 'do-over' and instead addressed numerous changed circumstances of the case." First it argues that it challenged allegations in the "Fifth Amended Complaint, which had added new parties and a host of new facts that framed the pleading in a manner quite different from the Second Amended Complaint that was the subject of [defendant]'s earlier motion." Defendant does not explain, however, how the addition of new parties altered plaintiffs' causes of action against defendant or caused it to assert new legal arguments or address new factual issues in its summary judgment motion. Moreover, as for the "host of new

---

[6] In its separate statement in support of its second summary judgment motion, defendant added the undisputed material fact that during its ownership of 12504 Whittier Boulevard—i.e., 1963 to 1966—it did not receive notice of contamination that posed a threat to human health and cited supporting evidence it had not cited in support of its first summary judgment motion. That undisputed fact did not materially alter the basis for any of defendant's arguments. In support of its claim that it did not have actual knowledge that the air or drinking water within the building on the ROP Site was contaminated to such a degree that it posed a dangerous risk to human health, defendant cited Dr. Beck's report concerning causation between the alleged contamination at the ROP Site and plaintiffs' asserted maladies. Dr. Beck's report had no bearing on the issue of defendant's actual knowledge of contamination.

11

facts" that allegedly made the fifth amended complaint "quite different" from the second amended complaint, defendant does not identify any such "new facts" in the fifth amended complaint, and instead unhelpfully asks us to discern those facts by comparing the entirety of its first summary judgment motion with the entirety of its second summary judgment motion.

Defendant states that it brought its second summary judgment motion "only after fact discovery had closed and newly discovered facts addressing or contextualizing the new pleading had come to light." Defendant fails to identify the facts upon which this statement is based and, as support, cites without explanation the trial court's ruling on other defendants' demurrers to the second amended complaint and a nonexistent Code of Civil Procedure section (purportedly citing Code of Civil Procedure section 2040.20, subdivision (a)).

Defendant also contends that it properly brought its second summary judgment motion because its causation argument was a new legal argument based on new evidence. The causation argument in defendant's second summary judgment motion was not supported by new law—i.e., the "change of law" that section 437c(f)(2) requires. Defendant cited only one opinion in its second summary judgment motion and reply in support of that motion—*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747—that was issued after the hearing on defendant's first summary judgment motion, and defendant does not contend that that opinion changed the law on causation thus allowing it to advance its causation argument. Nevertheless, defendant properly brought its second summary judgment motion with respect to its causation argument because the motion was based on new evidence. As set forth above, in support of its argument that plaintiffs could not establish causation between the alleged contamination at the ROP Site and their asserted maladies, defendant relied on Dr. Beck's report. The hearing on defendant's first summary judgment motion took place on September 28, 2012, and Dr. Beck's report is dated October 15, 2013. Because defendant's causation argument relied on new facts, it properly brought this part of its second summary judgment motion. (*Le Francois v. Goel, supra,* 35 Cal.4th at pp. 1096,

12

1104, 1107; *Schachter v. Citigroup, Inc., supra,* 126 Cal.App.4th at p. 739; *Bagley v. TRW, Inc., supra,* 73 Cal.App.4th at pp. 1096-1097.) Finally, defendant contends that "the trial court invited [it] to file a second summary judgment motion as an alternative to a planned motion pursuant to *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367. Indeed, during the hearing on [defendant's] demurrer to the Fifth Amended Complaint on November 21, 2013, the trial court encouraged [defendant] to seek resolution of the claims against it through a successive motion for summary judgment. In accordance with this invitation, [defendant] filed the motion, [plaintiffs] opposed, and both sides argued the merits of their motions before the trial court entered judgment in [defendant's] favor." (Record citations and a footnote omitted.) Defendant's contention appears to be intended to address the holding in *Le Francois v. Goel, supra,* 35 Cal.4th at pages1096 to 1097 and 1107 that when a trial court believes that its interim order denying summary judgment might be erroneous it may reconsider that order, on its own motion, even though there are no new facts or law that would justify a second summary judgment motion as long as it gives the parties notice that it may reconsider the order and an opportunity to litigate the issue. Defendant's contention is not supported by the record and is misleading.

As support for the contention that the trial court invited it to file a second summary judgment motion as an alternative to a motion under *Cottle v. Superior Court, supra,* 3 Cal.App.4th 1367, defendant cites its own reply brief in support of its second motion for summary judgment where it asserted, without any supporting evidence such as a minute order or reporter's transcript, that "the Court invited the pending motion as an alternative to one filed pursuant to *Cottle v. Superior Court* (1992) 3 Cal. App. 4th 1367 . . . ." Although the trial court may have "invited" defendant to file a second summary judgment motion as defendant asserts, defendant has failed to support that assertion with a record citation to a statement or order by the trial court. As for defendant's apparent contention that it filed its second summary judgment motion in response to the trial court's statements at the hearing on defendant's demurrer to the fifth amended complaint, defendant filed its second summary judgment motion prior to the demurrer hearing, a fact discussed at the demurrer hearing. Moreover, Judge Fruin's

13

statements at the demurrer hearing conveyed the view that a summary judgment motion rather than a demurrer would better address the fifth amended complaint's "enormous number of allegations" and did not suggest that he had reconsidered Judge Buckley's ruling on defendant's first summary judgment motion.  Accordingly, defendant has failed to demonstrate, within the holding in *Le Francois v. Goel, supra,* 35 Cal.4th 1094, that Judge Fruin believed that Judge Buckley's ruling on defendant's first summary judgment motion might be erroneous and thus "invited" defendant to file a second summary judgment motion.

## III.    Causation

Plaintiffs contend that the trial court improperly placed the burden on them of demonstrating causation and failed to consider whether defendant made a prima facie showing that there were no triable issues of material fact with respect to causation.  In addition to that error, plaintiffs contend, the trial court erred in failing to find that they demonstrated a triable issue of material fact with respect to causation.

### A.    *Defendant Made a Prima Facie Showing That There Are No Triable Issues of Material Fact as to Causation*

A defendant has met its burden of showing that there is no merit to a cause of action and thus is entitled to summary judgment by showing that one or more elements of a cause of action cannot be established.  (Code Civ. Proc., § 437c, subd. (p)(2); *Greene v. Bank of America, supra,* 236 Cal.App.4th at p. 932.)  Causation is an element in every tort action.  (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal. 4th 861, 876.)

Plaintiffs contend that the trial court failed to consider whether defendant made a prima facie case that they could not prove causation.  They claim that defendant failed to make such a case because defendant's expert, Dr. Beck, was not qualified to offer conclusions about plaintiffs' medical conditions because she was a toxicologist and not a medical doctor, her report lacked a foundation because she provided a conclusion on

14

causation without any basis or analysis, and she failed to consider plaintiffs' long-term exposure and based her analysis on contamination levels beginning in March 2010. Apparently, plaintiffs contend that the trial court erred in failing to exclude Dr. Beck's report. Whether we review the trial court's implicit rejection of plaintiffs' objections to Dr. Beck's report de novo or under an abuse of discretion standard (see *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535), the trial court properly considered the report.

Dr. Beck did not testify as an expert in medicine and thus did not render her opinion on causation to a """"reasonable *medical* probability.""" (See *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th. 71, 79, italics added.) Rather, she testified as an expert in science and opined "to a reasonable degree of *scientific* certainty, that it [was] highly unlikely that Plaintiffs' potential exposures to [the chemicals of concern] in indoor air at the ROP . . . buildings could have caused or actually caused their claimed health effects or could cause adverse health effects in the future." (Italics added.) Dr. Beck was qualified to render that opinion. She was a Fellow and Past President of the Academy of Toxicological Sciences and a Visiting Scientist in the Department of Environment Health at the Harvard School of Public Health. She had been a Regional Expert in Toxicology and Chief of the Air Toxics Staff at Region 1 of the EPA. She became a Diplomate of the American Board of Toxicology—i.e., board certified—in 1988, and specialized in human health risk assessment. In ruling that plaintiffs could not establish causation, the trial court implicitly found Dr. Beck to be a qualified expert and that her report established a prima facie case that plaintiffs could not show causation. A trial court has "considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*People v. Kelly* (1976) 17 Cal.3d 24, 39, abrogated by statute on another point as explained in *People v. Wilkinson* (2004) 33 Cal.4th 821, 845-848.)

There was a sufficient foundation for Dr. Beck's report. In Dr. Beck's detailed report, she stated that she relied on case-specific documents such as medical records, questionnaires, depositions, air quality data, and complaints; general guidance documents in the fields of toxicology and risks assessment by the EPA, Agency for Toxic

Substances and Disease Registry (ATSDR), and the California Environmental Protection Agency; environmental and regulatory documents that included toxicity criteria and secondary toxicological reviews of the chemicals of concern; and scientific literature on toxicology, epidemiology, and risk assessment of the relevant chemicals.

As set forth above, Dr. Beck performed hypothetical cancer and non-cancer risk assessments in accordance with EPA guidelines and toxicity criteria and California cancer and non-cancer toxicity levels using plaintiffs' respective employment histories and indoor air data information for the ROP Site during the period from March 2010 to December 2012. She considered each plaintiff's specific health claims, the plaintiff's length of employment at the ROP Site, and where in the ROP Site the plaintiff worked. She then evaluated the potential for "causal associations" between exposure to the chemicals of concern and the plaintiff's claimed health effects.

In that evaluation, relying on ATSDR toxicological profiles for the chemicals of concern, she first "evaluated qualitatively whether scientific evidence exist[ed] to support a causal relationship between exposures to the [chemicals of concern] and claimed health effects under any conditions." Next, she "compared the highest UCLM [upper confidence limit of the mean] exposure concentrations in the ROP building to [chemicals of concern]-specific health-based toxicity criteria (reference concentrations, or RfCs) and points of departure (PODs). The RfC is an estimate (with uncertainty spanning perhaps an order of magnitude) of continuous inhalation exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime . . . . PODs are 'the dose-response point that marks the beginning of a low-dose extrapolation' . . . to a cancer or non-cancer toxicity criterion. For air contaminants, the POD is traditionally the lowest concentration at which adverse effects have been observed in humans or animals, or the highest concentration at which no adverse effects have been observed. To evaluate the potential for non-cancer effects, [she] compared UCLM exposure concentrations to the RfC and POD from which the RfC was derived. . . . To evaluate the potential for cancer effects,

[she] compared UCLM exposure concentrations to the POD serving as the starting point for deriving US EPA inhalation cancer criteria (*i.e.,* inhalation unit risks)."

In reaching her conclusions, Dr. Beck considered historic chemical exposure levels. Dr. Beck relied on indoor air data from several rooms in the ROP taken from March 2010 to December 2012. She then calculated the maximum value for each chemical of concern for each room. Based on that data, she conducted a hypothetical risk assessment for the following scenario: a full-time worker at the ROP for 14 years who was exposed at all times to the highest UCLM concentration for each chemical of concern. Dr. Beck's use of actual indoor air data and maximum exposure levels for each chemical properly considered historic levels of chemical contamination.

Plaintiffs also argue that the trial court held them to an improperly high standard of proof on summary judgment when it ruled that their evidence was "insufficient to establish a causal connection between their alleged injuries and their alleged exposure to the toxins released on the Omega site." Instead, plaintiffs argue, they were only required to raise a triable issue of material fact as to the causal connection between the alleged contaminants and their asserted maladies. The trial court did not hold plaintiffs to an improperly high standard in opposing defendant's summary judgment motion. At the summary judgment hearing, plaintiffs' counsel argued that Dr. Byers's opinion that there was an association between many of plaintiffs' asserted maladies and alleged chemical contamination was a sufficient showing of causation to survive summary judgment because Dr. Beck's report—i.e., defendant's prima facie case on causation—"only says that there's no association because of the levels, the present levels that she was looking at. Again, she never looked at historical numbers. She says there couldn't possibly be an association based on the levels. That's all she did." The trial court rejected plaintiffs' argument, stating that plaintiffs were incorrect that "something's enough for summary judgment. You have to raise a triable issue on summary judgment . . . ." Thus, the trial court expressly applied the correct summary judgment standard, and only required plaintiffs to show a triable issue of material fact.

17

B.      *Plaintiffs Failed to Demonstrate a Triable Issue of Material Fact as to Causation*

In its ruling granting summary judgment, the trial court stated, "plaintiffs' evidence is insufficient to establish a causal connection between their alleged injuries and their alleged exposure to the toxins released on the Omega site. Plaintiffs have produced no competent evidence to contradict the opinion of defendant's expert, Dr. Barbara D. Beck, Ph.D[.] in this regard. As plaintiffs' toxicologist, Dr. Vera S. Byers, M.D., Ph.D[.] relies on assumptions not supported by the evidence, the objections to her testimony are sustained. Further, she fails to render her causation opinion in terms of a 'reasonably [*sic*] medical probability,' as required by *Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th. 71, 79." Plaintiffs contend that the trial court erred in granting defendant summary judgment based on its causation ruling because they showed a triable issue of material fact concerning causation.

As plaintiffs explain in their reply brief, their evidentiary showing on causation consisted of two parts. First, Mr. Hesse and Dr. Rosenfeld provided evidence of the levels of chemical exposure that each of the plaintiffs suffered at the ROP Site. Second, based on that chemical exposure evidence, Dr. Byers "considered whether causal connections existed between Plaintiffs' exposure to the subject chemicals and Plaintiffs' medical conditions or issues with their health." Dr. Byers's expert opinion was the only evidence that addressed that aspect of causation—i.e., that addressed whether there was a causal link between plaintiffs' alleged exposure to the chemicals at issue in this case and plaintiffs' asserted maladies. As set forth above, however, defendant objected to Dr. Byers's report, plaintiffs did not respond to those objections, and the trial court sustained the objections. When the trial court sustained defendant's objections to Dr. Byers's report, Dr. Byers's report was excluded from plaintiffs' evidentiary showing. Plaintiffs have not challenged the trial court's ruling on appeal. Accordingly, without Dr. Byers's opinion on causation, plaintiffs are unable to show that the trial court erred in finding that plaintiffs failed to show a triable issue of material fact and thus in granting defendant summary judgment.

**DISPOSITION**

The judgment is affirmed.  Defendant is awarded its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MOSK, J.

We concur:

TURNER, P. J.

BAKER, J.

19